Submitted on record and brief March 1, reversed April 18, 2007

John HAYES,
*Petitioner-Respondent,*

*v.*

Christie HAYES,
*Respondent-Appellant.*

Polk County Circuit Court
06P2181; A132489

157 P3d 324

Rachel Negra filed the brief for appellant.

No appearance for respondent.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Carson, Senior Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

Respondent Christie Hayes (Christie) appeals the trial court's restraining order under the Family Abuse and Prevention Act (FAPA), ORS 107.700 to 107.735. Christie argues that there was insufficient evidence to support (1) a finding that petitioner John Hayes (John) was in fear of imminent bodily injury, and (2) a finding that he was in imminent danger of further abuse. *See* ORS 107.710(1). On *de novo* review, we conclude that John did not prove by a preponderance of the evidence that he was in fear of imminent bodily injury. *Rosiles-Flores v. Browning*, 208 Or App 600, 602, 145 P3d 328 (2006). We reverse.

John and Christie were married in 2002, and a petition for dissolution of marriage was filed in 2005. They have two children, ages 3 and 5. As part of the dissolution proceeding, the parties completed mediation regarding child custody and agreed to a stipulated general judgment of dissolution. The children would reside primarily with Christie at her mother's home in McMinnville, and John would have parenting time with the children, initially, for two weekends each month, from 7:00 p.m. on Friday evening to 7:00 p.m. on Sunday evening. The parties later agreed to increase John's visitation to three weekends each month because things had been "going very well" between the parties. The stipulated general judgment of dissolution was sent to John's attorney, but was never signed by John.

On April 21, 2006, John received a letter from the Department of Human Services (DHS) stating that it was classifying recent allegations of child neglect, as to Christie, as "founded." The letter stated that, although no reports of sexual abuse were made, DHS had concerns about the safety of the children, based on information that Christie had been involved in a relationship with a registered, but untreated, sex offender. Consistent with the parties' agreement, Christie delivered the children to John that same day. John was concerned for the children's safety and upset regarding the DHS letter; he contemplated not returning the children to Christie. That weekend, Christie attempted to speak to the children, but was not successful and left telephone messages.

On April 23, Christie called John before 7:00 p.m. to see if he had left his residence to return the children to Christie. Although John was not always punctual, Christie became extremely concerned when John did not arrive by 8:00 p.m., an hour after the designated return time. Christie called John's home again and spoke with his girlfriend. She asked to speak to John, but his girlfriend refused, saying that John did not want to speak to Christie. John's girlfriend also explained that, because of the DHS letter, they were keeping the children. Christie again asked to speak to John, and his girlfriend again refused.

Christie called back several times, but never spoke to John that night. Christie then called the Dallas Police Department for assistance in retrieving the children. After speaking to Christie about the situation, Officer Vidrio went to John's home to speak to him regarding the children's return. John told the officer that he did not believe that the children were safe because of the DHS assessment and showed the letter to the officer. John did agree to return the children, and Christie sent her mother's friend, Welty, to pick them up.

Later that evening, Christie again called the Dallas Police Department because Welty had knocked on John's door for five to 10 minutes, but received no response. Because Officer Vidrio was on call elsewhere, he asked Officer Calef to respond. After a briefing from Officer Vidrio, Officer Calef spoke with Christie regarding John's failure to answer the door and allow Welty to pick up the children. Officer Calef drove to John's home and met with Welty. The officer also knocked on the door with no response; he and Welty then left without the children.

On April 25, John filed a petition for an *ex parte* restraining order. In his petition, he alleged that Christie had threatened that her "brother would take my life" and "that [Christie] herself would cause bodily harm to my [children's] care provider and myself." John also alleged that, during their marriage, Christie had threatened him with bodily injury when they disagreed on issues concerning the dissolution and custody of the children.

At the hearing, all parties mentioned above testified to the events of April 23. Christie denied threatening John or his girlfriend at any time that night. Additionally, both Welty and Christie's mother confirmed that they were present when Christie called John's home; they did not hear Christie make any threats over the telephone or mention her brother's name. Christie's mother testified that Christie was very upset when John's girlfriend would not let her speak to John. Officer Vidrio denied that John mentioned any threats by Christie against him or his girlfriend, or that he had had any conversations with John's girlfriend other than saying "Hi."

John's girlfriend testified, in contradiction to Officer Vidrio's testimony, that she had told the officer that Christie had threatened her. Specifically, she testified that Christie had threatened to "kick [her] face in and beat [her] ass," and that John's girlfriend believed Christie.

John admitted that he did not speak with Christie at any time that evening. He also attributed the threats of bodily harm alleged in his petition to threats made by Christie's boyfriend and her brother in November 2005:

"[CHRISTIE'S COUNSEL:]   * * * What do you mean when you said [in your petition] that [Christie] would cause you bodily harm, what does that mean?

"[JOHN:]   She has * * * people come over, and * * * her boyfriend * * * to kick my ass, or her brother.

"[CHRISTIE'S COUNSEL:]   And she said these things to you that night?

"[JOHN:]   No, she had—she told my mom that. It's on that one police report.

"[CHRISTIE'S COUNSEL:]   That police report dated November of 2005?

"[JOHN:]   Yeah.

"[CHRISTIE'S COUNSEL:]   So this was not—this is not threats that she made on April 23rd. You're saying this is regarding an incident back in November?

"[JOHN:]   Yeah."

Additionally, on April 23, John knew that Christie's brother was incarcerated and would not be released for about 30 to 40 months. Although he did not personally hear Christie's threats, John was afraid of Christie because of "[w]hat she can do, yeah. I mean, I have her kids." John never signed the stipulated judgment of dissolution; however, he testified that he would have "[i]f it [weren't] for the DHS[ ] letter I got * * *."

Both parties testified that, in November 2005, John kept their son for 13 days and refused to return him to Christie. During that incident, Christie retrieved their son from John's mother's home and told John's mother that her brother would "kick [John's] ass."

The trial court found that John "was afraid that [Christie] was going to come down and get him because he had the children." Despite acknowledging that John never spoke to Christie on April 23, the trial court issued the FAPA restraining order based on the petition's allegations of bodily injury and on petitioner's girlfriend's testimony:

"[THE COURT:] And then when [the petition] says how has [Christie] threatened you, then [John] goes and talks about things that happened within the 180 days but not the things that happened on [April 23,] because he was saying that the brother threatening him was not happening on April 23, because [John] admits he never talked to [Christie], that it happened at an earlier time when the brother was, I assume from what he was talking, was not in jail. And [Christie] caused—well, that cause bodily injury to my children's care provider[, John's girlfriend,] and myself. That might have been that night where [John's girlfriend] said [Christie] said so.

"* * * * *

"Well, I'm satisfied that, given the fact that * * * a liberal reading of what [John] put down [in his petition], even though it was in a different order and [he] wrote down things in one line when he should have put it in a different line or a different box, is enough to allow for a restraining order."

After the trial court issued the order, the parties spoke at length regarding child custody and visitation. Both

parties seemed very committed to the children's well-being and safety; John stated that he was still willing to sign the stipulated judgment of dissolution, and Christie stated:

> "If the relationship with [my boyfriend] is the only thing that [John] has a problem with, my relationship is nothing to me. My children are everything to me."

■ Christie challenges the trial court's findings that there was sufficient evidence that she placed John in fear of imminent bodily injury and in imminent danger of further abuse. On *de novo* review, we agree with Christie that the trial court erred.

Our opinion in *Fielder v. Fielder* outlines the requirements to issue a FAPA restraining order:

> "[(1) the *petitioner*] has been the victim of abuse *committed by the respondent* within 180 days preceding the filing of the petition, that [(2)] there is an imminent danger of further abuse *to the petitioner* and that [(3)] the respondent represents a credible threat to the physical safety of the petitioner * * *."

211 Or App 688 at 693, 157 P3d 220 (2007) (citing ORS 107.718(1) (emphasis added)). A petitioner must satisfy all three requirements for a FAPA restraining order.

■ The analysis of ORS 107.718(1) starts by determining whether John is a "victim of abuse."[1] John alleges that he is a victim of abuse because Christie placed him in fear of imminent bodily injury. Establishing "fear of imminent bodily injury" does not require overt threats, subjective fear by the petitioner, or physical violence. *Fielder*, 211 Or App at 693-94 (citations omitted).

---

[1] "Abuse" under ORS 107.705(1) is defined in part:

"(1) * * * *the occurrence of one or more of the following acts between family or household members*:

"(a) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury.

"(b) *Intentionally, knowingly or recklessly placing another in fear of imminent bodily injury.*

"(c) Causing another to engage in involuntary sexual relations by force or threat of force."

(Emphasis added.)

■ However, even if a petitioner makes subjective assertions of fear, a FAPA restraining order will not be affirmed when there is insufficient evidence that the alleged conduct creates an imminent danger of further abuse and a credible threat to the physical safety of the petitioner. *Roshto v. McVein*, 207 Or App 700, 704-05, 143 P3d 241 (2006).

The trial court found that John's allegations regarding the threat of Christie's brother "kicking his ass" were attributed to the November 2005 incident. John admitted that Christie did not threaten him or speak to him at any time during the night of April 23. Threats on that night by Christie, if any, were directed toward John's girlfriend.[2] Furthermore, we find credible the testimony of Officer Visidro that neither John nor his girlfriend relayed that any threats were made by Christie to John. John has not proved, by a preponderance of the evidence, that Christie placed him in fear of imminent bodily injury.

Based on the record before us, John has not shown, by a preponderance of the evidence, that he was in fear of imminent bodily harm; we therefore reverse the FAPA restraining order.

Reversed.

---

[2] Under FAPA, the definition of "abuse" limits the conduct to sustain a FAPA restraining order to acts between family or household members:

"(3) 'Family or household members' means any of the following:

"(a) Spouses.

"(b) Former spouses.

"(c) Adult persons related by blood, marriage or adoption.

"(d) Persons who are cohabiting or who have cohabitated with each other.

"(e) Persons who have been involved in a sexually intimate relationship with each other within two years immediately preceding the filing by one of them of a petition under ORS 107.710.

"(f) Unmarried parents of a child."

ORS 107.705(3). Christie argues that threats between her and John's girlfriend cannot be the proper basis for a FAPA restraining order, because John's girlfriend is not a "family or household member." Because we agree that, even if Christie threatened John's girlfriend on April 23 in addition to the November 2005 incident, John was not in imminent danger of further abuse, we do not address the issue of whether threats against a third party may sustain such an order.